## 14248

## STATE v. DICKERSON

(184 S. E., 585)

*Messrs. Price & Poag,* for appellant,

*Messrs. J. G. Leatherwood, Solicitor,* and *Thos. A. Wofford, Assistant Solicitor,* for the State,

March 9, 1936.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

This case, the State, as respondent, against J. W. Dickerson, appellant, comes to this Court on appeal from a conviction of the said J. W. Dickerson of involuntary manslaughter, in the Court of General Sessions for Greenville County, wherein the appellant was sentenced by the trial Judge of said Court, the Honorable C. C. Featherstone, to serve a period of nine months in the State penitentiary or upon the public works of the said County of Greenville. As set forth in the transcript of record, the defendant J. W. Dickerson, and T. J. Taylor, were indicted at the January, 1935, term of Court, charging them with the murder of one John Wesley Baswell, who was killed in an automobile wreck on

the Greenville-Greer Highway on the night of November 3, 1934. On the trial of the case January 24, 1935, the said J. T. Taylor was not put on trial. He was used as a witness and the said J. W. Dickerson only was tried.

The allegations of error imputed to the trial Judge are set forth under two exceptions, reading as follows:

"Exception 1. That his Honor erred in refusing to permit the defendant to bring out in the testimony from Green Taylor, Greer policeman, the statement made to him by one Mr. Atkins, the driver of the West Virginia truck.

"Specification of Error: It is respectfully submitted that this statement was part of the *res gestae,* being made within 15 or 25 minutes of the accident and while all of the parties were still present, and was unquestionably a part of the *res gestae.* The exclusion of this testimony was prejudicial to the defendant, in that the said Atkins was a resident of West Virginia and could not be forced by the defendant to appear at the trial, and the statement made by him at the time as to who was driving the truck was material and important to the defendant, and, being made under the circumstances, was clearly a part of the *res gestae.*

"Exception 2. That his Honor erred in overruling defendant's motion for a directed verdict upon the ground that there was not sufficient evidence to go to the jury in support of the allegations of the indictment, that the defendant had recklessly killed the deceased and that there was no evidence of a reckless act on the part of the defendant.

"Specification of Error: It is respectfully submitted that under the law of this State a defendant in such a case as the one at bar cannot be convicted upon proof of simple negligence, but that the State has to prove gross negligence or recklessness, and that there was no proof that the defendant was guilty of negligent conduct, which was the proximate cause of the death of the deceased."

The physician who made the post mortem examination of the body of the deceased, John Wesley Baswell, tes-

tified during the course of his examination, that he found numerous bruises on the body of the deceased; that almost every bone in his skull was fractured; the left side of his face crushed, and also called attention to other wounds of the body. It is conceded that the death of the deceased was caused by the collision, and in this connection we call attention to some of the facts leading up to his death.

On the night of the accident involved, resulting in the death of the deceased, John Wesley Baswell, the said John Wesley Baswell, in company with three other parties, his wife, Mr. Maurice Hempley, and Miss Jeanette Ballenger, after dining at the home of Mr. Baswell, attended a show in the Town of Greer; when the show was over, the four, riding together in an automobile, started to the home of Miss Ballenger some distance away at Chick Springs, for the purpose of taking Miss Ballenger home, and on their way to Miss Ballenger's home the accident in question occurred. It appears that they were riding in a Ford roadster, which had a rumble seat, but that all four of the parties, Mr. Baswell, his wife, Mr. Hempley and Miss Ballenger sat in the front seat, with Mr. Baswell driving the car. Mr. Baswell owned the car. In this connection the witness, Mr. Hempley, testified as follows:

"Q. Now, go ahead and tell this jury what, if anything, happened to you all while you were bringing her home; talk out loud so they can hear you? A. We were going down the road on our right side, and I saw the car coming; the lights of the car, and we got close distance, and the truck pulled in front of us off the right hand side of the road over to the left.

"Q. You all were driving on your right hand side coming toward Greenville? A. Yes, sir, on the right.

"Q. When you first saw the truck, what side of the road was the truck on? A. On his side of the road.

"Q. His right hand side going toward Greer? A. Yes, sir.

"Q. You all were going in the opposite direction? A. Yes, sir.

"Q. Now go ahead and talk out; and then what happened? A. We got in close distance of the truck; he pulled over in front of us intending to turn off, off the road.

"Q. Was there a filling station on your right hand side of the road? A. There was some cabins and I don't know whether they have a filling station or not.

"Q. Go ahead. A. And when he did that he blocked the road, and Mr. Baswell swerved his car to the left to try to avoid hitting him and crashed into the side of the truck, and after the crash I don't remember anything about it.

"Q. The last time you remember seeing that truck, Mr. Hempley, what was its position in that road? A. It was cross-ways of the road at an angle.

"Q. At an angle? A. Or forty-five degrees; it was like this, like the road was like this and it was setting this way.

"Q. Had it completely blocked you all's right hand side of the road? A. Yes, sir.

"Q. You say the driver of the automobile, Mr. Baswell, cut his car to the left? A. Yes, sir.

"Q. And struck the truck? A. Yes, sir.

"Q. Do you remember any more after that? A. No, sir.

"Q. When was the first time you regained consciousness? A. I was lying out in the road when I came to myself; I don't know how long it had been.

"Q. What did you do at that time? A. Got up and went around back of the car and got Miss Ballenger and got her and let her sit down in another car that had stopped.

"Q. Was she lying out in the road, too? A. Yes, sir.

"Q. Did you see Mr. Baswell there? A. Yes, sir.

"Q. Where was he lying? A. He was lying on the upper side of the car.

"Q. Did you go to him? A. Yes, sir.

"Q. Did you examine him? A. No, sir.

"Q. Could you tell whether or not he was dead? A. I couldn't tell for sure.

"Q. And where this accident happened, that is in Greenville County, is it? A. Yes, sir.

"Q. Now, I will ask you this, had you had anything to drink that night? A. No, sir.

"Q. Had Mr. Baswell had anything to drink that night? A. No, sir.

"Q. You had been with him how long? A. Well, it had been about four hours and a half from the time I was with him until the accident.

"Q. Had anybody in the crowd had anything to drink? A. No, sir.

"Q. How fast were you all driving when you saw this truck? A. I would say between thirty-five and forty miles an hour.

"Q. Did you see this other truck on the side of the road there? A. Which truck is that?

"Q. Did you see the second truck, the one parked there? A. No, sir.

"Q. You never did see that truck at all? A. No, sir.

"Q. Did you receive any injuries in this accident? A. Yes, sir.

"Q. What injuries, if any, did you receive? A. I received a severe cut on the lip, a bunch of my teeth knocked out, and my leg.

"Q. Did they carry you to the hospital? A. Yes, sir.

"Q. About the road there where the accident happened, is there any curve there or is the road straight? A. The road is perfectly straight.

"Q. From the time you first saw that truck and from the time he could see you, what would you say the distance would be? A. He could see us for a hundred or a hundred and fifty yards.

"Q. How far could he have seen the lights on your car? A. I don't know exactly, it is a good ways, though.

"Q. How far could you see his, approximately? A. I could see about two hundred yards.

"Q. Now, then, did you have your lights turned on on the car? A. Yes, sir.

"Q. Were the lights on on the truck? A. Yes, sir.

"Q. Did you examine the truck after that? A. I did not.

"Q. Let's get one point straight; I will ask you this; going toward Greer on the highway where the accident happened, which side of the road are those cabins and filling station on, going toward Greer from here? A. On the left hand side of the road.

"Q. And the truck was traveling toward Greer? A. Yes, sir.

"Q. And you were traveling toward Greenville? A. Yes, sir.

"Q. How far is that from Wingo's Camp out there? A. From Wingo's Camp, I imagine it is about three hundred yards.

"Q. About three hundred yards toward Greer or toward Greenville? A. Toward Greenville.

"Q. Three hundred yards this side of Wingo's Camp? A. Yes, sir.

"Q. Is that all you know about this? A. Yes, sir; that is all I know about it."

On the cross examination this witness, Maurice Hempley, testified, in substance, as follows:

"I am absolutely positive that all four of us were in the front seat and that Miss Ballenger and myself were not in the rumble seat. I don't think four persons riding in that manner hampers the driver. I think the driver can do as well that way as he could with plenty of room. It was about eleven-thirty at night. Just before you reach the point of the wreck, as you come from Greer, you come over a little rise about one hundred yards away, and the road is as straight as a gun barrel from the top of the rise to the point of the wreck. I deny that we were driving at 50 or 60 miles an hour.

"I didn't hear Mrs. Baswell say, 'Look out, John; you are going to hit that truck.' I just did not hear her say that. I admit we were driving 35 or 40 miles an hour, but this is just an estimate, as I was not looking at the speedometer; I was talking to Miss Ballenger. I did not see the other truck which we struck after hitting the rear end of Mr. Dickerson's truck. I did not pay much attention to the location of the automobiles afterwards, as I was entirely concerned about the people in my car. Mr. Dickerson's truck had gone almost across the road when we struck it. We hit him; he did not hit us. The first I noticed it, the truck turned across the road; we were 25 or 30 feet away. I do not know whether Mr. Baswell put on the brakes or not."

This witness, Maurice Hempley, in answer to additional questions asked on re-direct examination, stated: "The last time I remember seeing the truck about half of the body was on the left hand side of the road. I could not say exactly about the front wheels, but they were something like about the edge of the pavement."

One of the other surviving passengers in the Ford roadster, Miss Jeanette Ballenger, also testified in the case as a witness for the state. However, her testimony does not differ in any material way from that given by the witness, Maurice Hempley, that is, on material questions. She stated, however, in effect, that she was sitting in Mrs. Baswell's lap, and as they drew near where the collision occurred she heard Mrs. Baswell say, "Look out, John, you are going to hit that truck," and that as she turned and looked in front of her she saw the truck in question and felt the crash of the collision. It may be stated, however, that it appears from Miss Jeanette Ballenger's testimony that she and Mr. Hempley were in conversation and she evidently must not have been paying strict attention until arriving very close to the scene where the collision occurred. It appears that this lady was injured from the collision and became unconscious at the time because of the injuries received, and knew nothing of what transpired immediately afterward.

She was unable to say whether Mr. Baswell put on the brakes on the Ford in which they were riding as they came in contact with the truck.

One of the sharp issues between the parties at the trial was whether or not the defendant was driving the truck in question at the time of the collision. According to the testimony of the defendant, Dickerson, he was not driving the truck at the time of the accident. It was his contention that at the time of the collision J. T. Taylor. was driving the truck on which the defendants, Dickerson and Taylor, were riding. The substance of the defendant Dickerson's testimony, as disclosed by the record, appears as follows:

"I am sixty years of age and have been operating a Dodge truck for about a year. On the day in question I carried a load of furniture from Duncan, where I live, to Ware Shoals. My colored helper was not available that day and I asked J. T. Taylor if he would go with me. I absolutely deny buying three pints of liquor. The man we carried to Ware Shoals did get a pint of liquor, and I admit taking a drink or two, the last drink being while we were unloading the stuff at Ware Shoals. I drove the truck back about three miles out of Ware Shoals and stopped at a filling station and put in some oil, and Taylor drove from that time on, and Taylor was driving at the time of the accident. We wanted to stop at Johnson's place to get a sandwich. He keeps a bright light burning in front of his place, and it was burning at this time. Taylor had been drinking some, but I could detect nothing wrong with his driving. The last I saw of the bottle of liquor was at Ware Shoals, and Taylor put it in his sweater.

"We were driving on our right-hand side, and Johnson's place is on the left. When our truck started to cross the highway, this car came over the hill. When it got to us it was running at a rapid rate of speed. It appeared to me that there was ample time to cross the highway in safety when I first saw the lights of the car. Before the car got to us, I saw that it was running at a high rate of speed; I would say it

was running fifty miles an hour at least. It glanced the back end of my truck, and we just did feel it hit the back end. My truck stopped in four feet after it was hit. I jumped out and heard the car crash into the other truck down there on the other side of the road. As I jumped out I saw the deceased fly up in the air, and he fell on the pavement, and I started to him. You could have heard the crash against the other truck a good ways. I stayed around and did what I could until the officers carried us to Greer.

"I admit telling the officers at first that I was driving. I understood that Taylor did not have a driver's license at the time, and I went all to pieces and was nervous, and I just merely told them that because I was afraid it would hurt us because he had no license. As far as the driving is concerned, the boy did not do anything more than I would have done; he was not to blame whatever; I thought sure there was ample time to cross that highway in perfect safety."

In answer to questions on the cross examination, Mr. Dickerson, the defendant, admitted that there might have been a little of the truck in question on the pavement when the collision occurred, and further admitted that he was not on his right-hand side of the road when the collision occured. It was his contention that he was sober.

As a further explanation of some of the matters brought out in the testimony, Mr. Dickerson, on re-direct examination, stated: "I suppose it was 20 or 25 minutes after the wreck when Green Taylor, the officer, arrived at the place of the accident. I could not say when J. T. Taylor took the last drink. The last I saw him was at Ware Shoals, and he had the whiskey in his sweater. I was not with him all of the time when the officers were investigating the wreck before they took us to Greer. I did not know about the empty bottles in the truck, but my negro driver makes a business of collecting empty whiskey bottles and selling them, and when he would pick up bottles he would put them behind the seat, and that is the only way I can account for the empty bottles; I did not put them there myself."

Several witnesses, W. R. Jones, J. W. Woods, J. B. Brockman, T. R. Anderson, and W. D. Gettys, testified that they had known the defendant Dickerson for many years; knew his reputation in the community in which he lived, and that his reputation for peace and good order was good; that they had never heard of him being in trouble of any kind. Some of the witnesses also testified as to Dickerson's reputation for truth and veracity, and stated that his reputation for truth and veracity was good, and that they would believe him on his oath.

As stated, the other defendant, J. T. Taylor, was not put upon trial and he was called as a witness for the State. In the course of his testimony he stated that he had known Mr. Dickerson for about one year; that Mr. Dickerson lived at the same place he lived, the town of Duncan, and he also told of accompanying Mr. Dickerson on the trip in question. He admitted driving the truck part of the way, but he denied that he was driving the truck at the time of the collision in question when the deceased, Mr. Baswell, was injured, and, as a result, died, but on the other hand, testified that the defendant Dickerson was driving the truck at the time of the collision. This witness, J. T. Taylor, further testified that it was their purpose to stop at Johnson's for the purpose of getting a sandwich; that they were driving on the right-hand side of the road when they saw the lights of the approaching car in front, and as they turned across the road to make the stop the approaching car struck the truck. He said "we cut across in front of the approaching car. When they hit us, I would say half of our truck was off of the highway." He further testified that "just before we got off the highway this automobile hit us at the rear end." In answer to questions with reference to drinking, this witness, according to the record, gave the following testimony: "We had been drinking. When we got to Greer he stopped and got three pints of whiskey, and another fellow that we moved help drink those three pints, and I think we had a little left when the wreck occurred. The last drink we took was when we

stopped out on Augusta street before we entered the City of Greenville."

In this connection, we call attention to the following portion of the testimony of this witness, J. T. Taylor, given on cross examination: "Mr. Dickerson drove all of the way to Ware Shoals. He stated to me that he did not like to drive at night, and that was one reason he wanted me to go. Regardless of the liquor drinking, Mr. Dickerson drove all right through the City of Greenville, and he made the turn across the highway at the time of the accident as careful as the soberest driver I ever saw. The Ford car came over the hill just as we were fixing to make the turn. I do not know how far away the hill is, but he was turning when the Ford come over the hill. I can't say anything about the speed of the Ford; all I know is I saw lights coming. I could not say for sure whether there was plenty of time for the truck to cross the road if the Ford had not been running very fast."

This witness also testified, in effect, that Mr. Baswell had plenty of room to have driven around the truck on which the witness J. T. Taylor was riding, and which the defendant Dickerson was driving, if he was driving; that the second truck drove into the ditch of the other side of the road, and that Mr. Baswell had the entire pavement, which was about eighteen feet wide, except possibly two or three feet; that some part of their truck was on the pavement. The witness stated, however, in answer to question of counsel, "with this truck behind us, I don't know whether he could have got behind us or not. The witness gave further testimony along this line.

The witness Green L. Taylor, called by the State, in the course of his testimony stated that he was a policeman in the City of Greer, and was called to investigate the accident in question. When he arrived he found the defendant's truck completely off the road and over by the filling station, and he also found another truck on the opposite side of the road, twenty or twenty-five yards away, with its front part in the

ditch. The Ford automobile in question he found a little further. He observed some injuries on the Dickerson truck, five or six feet from the back end of its right side. He saw some signs of blood and flesh on the trailer referred to in the testimony. The Ford automobile in question was completely wrecked. He further testified that the defendant Mr. Dickerson was under the influence of liquor; that he was not down drunk, but he could walk, but the witness did not think that he was in shape to drive a car and did not think it was safe for him to be out on the highway. He further testified that Mr. Taylor (the other defendant in this case) was drunk and in no condition to drive. Mr. Green L. Taylor, the witness, further testified that Mr. Dickerson told him that he, Dickerson, was driving the truck and that the witness took Mr. Dickerson and Mr. Taylor to Greer and locked them up. Later on, it appears from the testimony of this witness, he again talked to Mr. Dickerson and told him that he wanted to know the truth about who was driving the truck and that time Mr. Dickerson answered him thus: "Well I was not driving it." At that time Mr. Dickerson did not tell him who was driving it. The witness further testified that Mr. J. T. Taylor did not make any statement to him about it. The witness further testified that on examination of the Dickerson truck he found some liquor therein in a bottle and he also found some empty pint bottles in the truck. This witness testified at length on cross examination regarding the matters referred to. However, we find no conflict with the testimony given on the direct examination, especially with reference to matters material to the appeal. But it was during the cross examination of this witness that objection was interposed by counsel for the State to certain questions propounded by counsel for the defendant, and exception interposed by counsel for the defendant to the ruling thereon by the trial Judge. The error alleged is set forth under Exception 1, to which we have referred; but will consider later herein.

L. B. Davis, a witness on behalf of the State, testified that as a deputy sheriff, he, with Mr. Guy Paris, another deputy sheriff, investigated the wreck. He talked to Mr. Dickerson, the defendant, at the Greer police station, and stated that Mr. Dickerson told him that he was driving the truck in question. The other testimony given by the witness Davis was, in substance, along the line testified to by other witnesses, as to what he found and the conditions surrounding the scene of the accident. We may add, however, that on cross examination this witness stated that when they got to the scene of the collision that the defendant Mr. Dickerson appeared to be perfectly sober; however, that he could tell that Mr. Dickerson had been drinking.

Mr. Guy Paris, a deputy sheriff, was also called as a witness for the State. His testimony, as stated in the records, is, in substance, the same as that given by the witness, Mr. Davis, the other deputy sheriff. In the course of his testimony, however, he stated that Mr. Dickerson admitted that he had had a drink or two of whiskey and the witness stated that he could tell that Mr. Dickerson had been drinking.

As shown above, appellant's first exception is based on his Honor's refusal to permit the defendant to bring out in the testimony from Green Taylor, Greer policeman, the statement made to him by one Mr. Atkins, the driver of the West Virginia truck. In order to understand the Court's ruling on which this exception is based it is well to read the testimony leading up to the ruling of his Honor, as follows:

"Q. Was any statement made by the West Virginia man, whose truck was on the other side, as to who was driving, in the presence of both these defendants? A. No, sir; they were not there.

"Q. How long was that after the accident? A. I say Mr. Davis and them was up at his truck, and these fellows were down at their truck when that was made.

"Q. How long was that after the accident? A. I don't know; quick as it was reported to me, I drove up there.

"Q. It was reported to Greer and you drove right out? A. Yes, sir.

"Q. Two or three miles? A. Yes, sir.

"Q. It could not have been over ten or fifteen minutes? A. Yes, sir; for they had come straight on out there, but we got the ambulance, of course, the ambulance beat me there and we had done left, they had done left with Mr. Baswell when I got there.

"Q. This statement of Mr. Atkins was not made in the presence of the defendants? A. No, sir.

"Q. How close were they to it? A. I guess they were something like twenty yards.

"Q. Just the distance of the two trucks apart? A. No, sir; his truck was setting down here and Mr. Dickerson's truck was up here like.

"Q. Well, could they not have heard it? A. I don't know, now, about that, there was such a crowd there then, Mr. Price.

"Q. Would you say it was more, in your opinion, over fifteen minutes from the time of the accident until you got there? A. I couldn't say positively about that, but I should think so; I should think it was over fifteen or twenty minutes.

"Q. I will ask you if there at the time if these men from West Virginia didn't make the statement that the young fellow was driving the truck, that he saw him get out of the truck, get out on the left hand side?

"By Mr. Wofford: I object to that.

"The Court: Yes, I don't think that is competent.

"By Mr. Price: Your Honor, it is part of the *res gestae*.

"The Court: Note the objection."

It will be noted from the above-quoted testimony of the policeman, Green L. Taylor, that considerable time had elapsed from the time the collision in question occurred to the time the West Virginia man made the statement counsel for defendant tried to bring out; that the defendants were

not present when the presumed statement was made; that the matter was reported from the scene of the collision, after the collision occurred, to the town of Greer, a distance of two or three miles away, and, as a result of the report being made to the town of Greer, where the policeman, Green L. Taylor, got the information that the wreck had occurred, this policeman drove out to the scene of the wreck. The policeman was unable to say how long it was after the accident before he got out to the scene of the accident. According to this policeman, the ambulance had gotten out to the scene of the collision before he arrived and Mr. Baswell, the injured man, had been taken away. This witness, the policeman, stated emphatically that the defendants were not present when the West Virginia man was making a statement concerning what had occurred. While some parts of the policeman's statements, regarding the whereabouts of the defendants at the time the West Virginia man was making his statement is not exactly clear, we do not think any other conclusion can be reached except that the defendants were not present and not close enough to hear what the West Virginia man was saying. As to the time that had elapsed we call attention to the following question and answer:

"Q. Would you say it was more, in your opinion, over fifteen minutes from the time of the accident until you got there? A. I couldn't say positively about that, but I should think so; I should think it was over fifteen or twenty minutes."

This testimony and what transpired in connection with the collision, as disclosed by the record, cannot, in our opinion, be held to authorize the question asked and the answer sought thereto on the theory that it is part of the *res gestae,* as contended by appellant. In support of his contention, counsel for appellant call attention to the case of *State v. Martin,* 94 S. C., 92, 77 S. E., 721, and quotes from the opinion of that case the following: "To make declarations admissible as a part of the *res gestae,* they must be contemporaneous

with the main fact; but, in order to be contemporaneous, they are not required to be concurrent in point of time. If the declarations spring out of the transaction, if they elucidate it, if they are voluntary and spontaneous, and if they are made at a time so near to it as to reasonably preclude the idea of deliberate design, they are then to be regarded as contemporaneous. *State v. Belcher,* 13 S. C., 459; *State v. Arnold,* 47 S. C., 9, 24 S. E., 926, 58 Am. St. Rep., 867; *State v. McDaniel,* 68 S. C., 304, 47 S. E., 384, 102 Am. St. Rep., 661."

In our opinion, the facts in the case at bar do not bring it within the rule declared in *State v. Martin, supra.* The declarations sought to be introduced by appellant on the trial in the lower Court do not, in our opinion, spring out of the transaction, or, if so, are not shown to be voluntary and spontaneous, but were made to the officers while the investigation was being made by the officers who viewed the scene after receiving the news two or three miles away at the town of Greer, and coming out to the scene thereafter for the purpose of making an investigation. Evidently whatever declaration or explanation Mr. Atkins, the West Virginia man, made at the time in question was made in the nature of a calm explanation or statement of what had taken place. In our opinion, the alleged utterance of Mr. Atkins could not be regarded as spontaneous. In this connection we wish to further state that in determining whether testimony constitutes a part of the *res gestae* is a question that must be left largely to the sound discretion of the trial Judge and let him say whether or not, under the surrounding circumstances, the testimony should be admitted. The exception raising this question must be overruled.

As above shown, the error imputed to the trial Judge under the second exception is based upon his Honor's overruling the defendan's motion for a directed verdict, made upon the ground that there was not sufficient evidence to go to the jury in support of the allegations of the indict-

ment, namely, that the defendant had recklessly killed the deceased, the defendant's contention being that there was no evidence of a reckless act on the part of the defendant.

While the indictment charged the defendant with murder, which embraced the offense of involuntary manslaughter, the latter-named offense was the only offense submitted to the jury for consideration, with which the defendant was charged. What constitutes involuntary manslaughter was made clear to the jury. His Honor made it clear that in order for the defendant to be convicted of the charge, the jury must reach the conclusion that the death of the deceased was caused not from mere carelessness, but through criminal carelessness, which includes recklessness. After reviewing the testimony carefully, which we have quoted at length herein, it is our opinion that the trial Judge could not, under the testimony, hold as a matter of law that the defendant was not guilty of criminal carelessness. Under the testimony, as we view it, that was clearly a question for the jury, and the trial Judge committed no error in refusing to grant the defendant's motion.

The exceptions are overruled, and it is the judgment of this Court that the judgment of the lower Court be, and the same is hereby, affirmed.

Mr. Chief Justice Stabler and Messrs. Justices Bonham, Baker, and Fishburne concur.

Mr. Chief Justice Stabler (concurring) :

With regard to the charge of the trial Judge as to voluntary manslaughter, to which attention is called by Mr. Justice Carter in his opinion, see *State v. Hanahan,* 111 S. C., 58, 96 S. E., 667; and annotation in 16 A. L. R., 914. It seems, under the facts of the case at bar as disclosed by the evidence, that the motion for a directed verdict was not only properly refused, but that the Court's instructions to the jury were more favorable to the defendant than he was entitled to.